UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMUEL CHAVEZ GARCIA, ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> ROBERT ARONA, and THE UNITED ) <br> STATES OF AMERICA, ) <br> ) <br> Defendants. ) | No. 17 C 6136 <br> Hon. Marvin E. Aspen |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Samuel Chavez Garcia ("Chavez") alleges Defendant Agent Robert Arona ("Arona"), acting on behalf of the United States in his role as a Drug Enforcement Agent, used excessive force during an encounter between Chavez and Arona on August 29, 2016. (Pl.'s 3d Am. Compl. ("TAC") (Dkt. No. 72) at ¶ 15.) Arona and the United States filed their motion for summary judgment as to all remaining counts. (Dkt. No. 68.) For the foregoing reasons, we deny summary judgment.

**BACKGROUND**

These facts are culled from the parties' submissions and are undisputed unless otherwise stated.

The DEA planned to conduct an operation to utilize a confidential source to obtain heroin. (Def. SOF (Dkt. No. 70) ¶ 2; Pl. SOF Resp. (Dkt. No. 79) ¶ 2.) On August 29, 2016, Agent Arona and other DEA agents executed their planned heroin purchase. (Def. SOF ¶ 3; Def. SOF Ex. 4 (Dkt. No. 70–4); Pl. SOF Resp. ¶ 3.) The DEA's confidential source contacted Juan

Carlos Gama by telephone and negotiated purchase of one kilogram of heroin. (Def. SOF ¶ 3; Pl. SOF Resp. ¶¶ 2–3.) Gama was to deliver the heroin to the confidential source near a business at 2500 W. 51st St. in Chicago around 2:45 p.m. (Def. SOF ¶ 3; Pl. SOF Resp. ¶ 3.) The parties dispute whether the agents knew *only* Gama was delivering the heroin, or whether there would be others involved in the delivery. (Def. SOF ¶¶ 3–4; Pl. SOF Resp. ¶¶ 2–4; Def. SOF Ex. 5 (Dkt. No. 70–5) at ¶ 3.) The agents set up surveillance in the vicinity of 2500 W. 51st St. in anticipation of the delivery. (Def. SOF ¶ 3.) At about 2:45 p.m., Gama instructed the confidential source to drive to the alley behind 2500 W. 51st St. and a back gate would be opened. (Def. SOF ¶ 5; Def. SOF Ex. 4 at 18.) DEA Agents observed Gama exit the rear of a nearby building and give a white plastic bag to the confidential source in the back alley. (Def. SOF ¶ 5; Def. SOF Ex. 6 ("McConnell Dep.") (Dkt. No. 70–6) 8:14–23.)

Then, Task Force Officer Benaitis and Special Agent McConnell met with the confidential source and recovered the plastic bag containing the suspected heroin. (Def. SOF ¶ 6; Def. SOF Ex. 4 at 18–19.) Benaitis and McConnell notified the other agents conducting the operation that a kilogram of suspected heroin had been recovered. (*Id.*)

At 3:07 p.m., Special Agent Anthony Friel called out over the radio that Gama had gone into the building at 2502 W. 51st St. (Def. SOF Ex. 9 ("Benaitis Dep.") (Dkt. No. 70–9) 17:24–18:2.) At 3:32 p.m., Special Agent Lessner observed a Hispanic male at the front of the residence, who he later identified as Chavez. (Def. SOF Ex. 4 at 19.) Chavez denies leaving the premises before Arona pulled him out. (Pl. SOF Resp. ¶ 10.) Chavez was the owner and landlord of 2502 W. 51st St. (Chavez Dep 8:15–19.)

Agents Ford and Lessner's notes indicate that at about 3:47 p.m., one of the Gama brothers and Chavez walked together to a liquor store. (Def. SOF Ex. 13 ("Lessner Notes"); Def.

SOF Ex. 14 ("Ford Notes").) Chavez says this happened later, after the DEA had detained him and he was released. (Chavez Dep. 34:16–35:10.) Chavez says instead that he was inside 2502 W. 51st St. with the Gama brothers. (Def. SOF ¶ 14.) Chavez claims that Marcos said that he wanted coffee and left. (*Id.*; Chavez Dep. 35:11–18, 59:19–25.) When Marcos did not return, Carlos went to look for him to run an errand. (Def. SOF ¶ 14.) When neither brother returned for an extended period, Chavez decided to leave. (*Id.* ¶ 15.)

The parties dispute what happened next. Arona claims Chavez opened the front door and saw that the DEA had detained both Gamas outside. (*Id.*) Chavez states that he went to the door and looked out the front window, but never opened the door. (Pl. SOF Resp. ¶ 15.) After seeing the DEA agent, Chavez attempted to leave the building through the back door. (Def. SOF ¶ 15; Pl. SOF Resp. ¶ 15.) Chavez locked the front door. (*Id.*) After locking the door, Arona instructed him to open the door. (Chavez Dep. 36:2–3; Arona Dep. 45:21–24.) Chavez realized at this point that Arona was a DEA agent from the DEA markings on his vest. (Chavez Dep. 38:25–39:3.) Chavez opened the door. (*Id.* 36:3–4.)

After Chavez opened the front door, Arona grasped him by the left arm. (Def. SOF ¶ 18.) Arona claims he felt what he perceived to be Chavez attempting to pull away from him. (*Id.*) Chavez claims he was reaching for his wallet to hand Arona his identification. (*Id.*) Chavez denies resisting or pulling away in any manner. (Pl. SOF Resp. ¶ 18.) Arona twisted Chavez's arms behind his back and handcuffed him. (Def. SOF ¶ 18; Pl. SOF Resp. ¶ 18.) The parties dispute the amount of force involved. (*Id.*)

Chavez alleges Arona placed him face-first on the ground to handcuff him, but that he did not hit the ground "too hard." (Chavez Dep. 37:2–18; 41:16–20.) Arona characterizes Chavez's testimony as saying he was picked up after a few second, and that this was not when he was

3

injured. (*Id.* 37:14–18, 41:16–20, 43:12–16.) Chavez denies he could know what could have caused his injuries. (Pl. SOF Resp. ¶ 19.) Arona denies ever placing Chavez on the ground. (Def. SOF ¶ 20.) Chavez was brought inside 2502 W. 51st St. where he was placed in the front portion of the building with both Gama brothers. (Chavez Dep. 45:1–16.)

On August 30, 2016, Chavez said he realized he could not move his left shoulder and had severe pain in it at rest. (Pl. SOF ¶ 6.) Chavez first attempted to see a doctor about his shoulder the day after the incident. (Pl. SOF Resp. ¶ 24; Chavez Dep. 72:18-73:2.) He called his doctor for an appointment, but was unable to get one until he was supposed to have left the country to secure a visa for his fiancé in Mexico. (Chavez Dep. 73:1–2.)

Chavez went to Mexico for between twenty-three and twenty-four days. (Pl. SOF ¶ 7.) Chavez went to a medical center in Mexico where he was examined and x-rayed. (*Id.*) Chavez was sent to get an MRI at the behest of the doctor, but he did not have money to pay for the test. (*Id.*) At this point he determined he would have to wait to seek treatment until he returned to the US. (*Id.*) Chavez was unable to see a doctor until mid-September. (*Id.*) Chavez scheduled a follow-up visit with a doctor in Chicago on October 18, 2016. (*Id.* ¶ 8.) Chavez denies history of left or right shoulder pain prior to his traumatic incident of August 29, 2016. (*Id.* ¶ 4.)

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record. . . ." Fed. R. Civ. P. 56(c)(1).

"The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party may not rest upon the mere allegations or denials of the adverse party's pleading, but rather must set forth specific facts showing that there is a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

## ANALYSIS

### I. Expert Disclosure

Defendant argues Chavez failed to properly disclose his expert witness, and therefore we must exclude all statements associated with the expert's report under Federal Rules of Civil Procedure 37(c)(1) and 26(a)(2). (Def.'s Reply to Pl.'s Statement of Fact ("Def. SOF Reply") (Dkt. No. 84) ¶¶ 1–14.) Arona also claims Dr. Triester's report is unauthenticated and therefore inadmissible hearsay. (*Id.*)

Rule 26(a)(2) requires disclosure to the other party the identity of any witness "it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P.

26(a)(2). "[Parties have] to disclose [their] expert testimony pursuant to a court ordered deadline, and if no deadline was set, at least 90 days prior to the start of trial." *Karum Holdings LLC v. Lowe's Companies, Inc.*, 895 F.3d 944, 951 (7th Cir. 2018). An order setting the end of discovery constitutes a court-ordered deadline for the purpose of identifying expert witnesses, even if it is more than ninety days before trial. *Hassebrock v. Bernhoft*, 815 F.3d 334, 341 (7th Cir. 2016).

The sanction of exclusion is "automatic and mandatory unless the sanctioned party can show its violation of Rule 26(a) was either justified or harmless." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (citation omitted). "[D]etermination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Id.* (citation omitted). The following factors guide our analysis: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

We explicitly set a deadline for the close of all discovery for September 1, 2019. (Dkt. No. 58.) We also clarified that this was a final deadline and no extensions would be allowed, putting Plaintiff on notice that any expert discovery must be completed by that date. (*Id.*) Since Chavez missed the deadline, we must exclude Dr. Treister's report unless the failure to comply with the timeline was either harmless or justified.

The *Caterpillar* factors suggest Chavez's late identification of Dr. Treister as an expert was neither harmless, nor justified. First, the disclosure occurred after a clear order stating the final deadline for *all* discovery was nearly two months before Chavez attached Dr. Triester's report. This alone is enough surprise to exclude the report. Second, the party cannot cure this

prejudice without reopening discovery, precisely the event Rule 26 is designed to prevent. *See Karum*, 895 F.3d at 951. Finally, there is no evidence of an excuse justifying this late expert disclosure. As a result, we exclude Dr. Triester's report under Rule 26.

## II. Qualified immunity

The Government asserts that Agent Arona cannot be liable for damages because qualified immunity shields him from liability. Chavez argues Arona violated his clearly established constitutional right against excessive use of force to effectuate an arrest, and therefore Arona is not entitled to qualified immunity. Alternatively, he argues that Arona's use of force was not objectively reasonable, such that qualified immunity would not protect him as a factually matter.

Qualified immunity analysis entails a two-step process: (1) a court must decide whether the facts the plaintiff has shown make out a violation of a constitutional right; (2) the court must decide whether the right was clearly established at the time of the defendant's misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 816 (2009). "While qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it." *Leiser v. Kloth*, 933 F.3d 696, 700 (7th Cir. 2019).

### A. Freedom from excessive force during arrest is a constitutional right

"In deciding a question of qualified immunity, the level of specificity at which the legal question is asked is often decisive, and it is possible to be too general and too specific." *Leiser*, 933 F.3d at 702. This requires us to consider "whether the violative nature of particular conduct is clearly established." *Id.* (quoting *Mullenix v. Luna*, —U.S.—, 136 S. Ct. 305, 308 (2015)).

Freedom from excessive force during an arrest is a clearly-established right under the Fourth Amendment. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018). "Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment

7

requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871 (1989) (quoting *Tenn. v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699 (1985)). "[P]roper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S. Ct. at 1872. This inquiry is an objective one, without regard to the officer's underlying intent or motivation. *Id.* at 397, 109 S. Ct. at 1872. (citation omitted). Each discrete use of force must be separately justified. *Dockery*, 911 F.3d at 467 (citing *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999)).

The *Graham* factors tip in Chavez's favor. *First*, Chavez posed no clear or immediate threat to the officers. The officers had not recovered firearms from either of the two previous arrestees. No agent reports seeing or noticing Chavez's involvement in the heroin sale that took place without incident about an hour before the Chavez-Arona incident.

*Second*, Chavez and Arona dispute whether there was an indication that Chavez intended to escape arrest. Crediting Chavez's account, as we must for the purposes of this motion, there was no indication of an intent to flee. The officer called for him to exit the building and Chavez then complied. The application of force took place *after* Chavez had already willingly exited the building. Thus, at the time Arona applied force to Chavez there was no indication of resistance.

*Third*, the severity of the crime at issue is debatable, given the lack of evidence establishing Chavez was involved in the sale of heroine. The severity of the crime is considered in terms of both whether the offense is a felony and whether it is a violent crime. *See Abbott v. Sangamon County*, 705 F.3d 706, 730 (7th Cir. 2013). While heroin distribution is a felony, there

8

was never any indication of risk of violence here. The heroin sale had also already occurred. Finally, although 2502 W 51st St. might be considered Chavez's "home turf," he willingly exited the building before any force was applied against him. *See Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 487. Thus, the alleged offense suggests some government interest in use of force, offset by the lack of connection between Chavez and the heroin sale.

*Finally*, the injury to Chavez was a "significant intrusion on [his] Fourth Amendment interests." *Abbott*, 705 F.3d at 730 (7th Cir. 2013). The putative unreasonable application of force is similar to *Morfin v. City of East Chicago*, where the officers grabbed the suspect, twisted his arm, and threw him to the floor. 349 F.3d 989, 1005 (7th Cir. 2003). *See also McCauley v. Sinott*, No. 13 CV 522, 2014 WL 5461519, at *1–2 (N.D. Ill. Oct. 23, 2014) (denying summary judgment on an excessive force claim with a similar injury). Thus, the *Graham* factors suggest a reasonable jury could find Agent Arona's use of force was excessive. We therefore decline to grant Defendant summary judgment on the issue of an actual constitutional violation.

### B. The right was clearly established

"Public officials are entitled to immunity unless, by the time of the contested acts, it was clearly established that those acts violated the Constitution." *Johnson v. Rogers*, No. 19-1366, 2019 WL 6872509, at *2 (7th Cir. Dec. 17, 2019) (slip op.) (citation omitted). "Many decisions hold that there is no clearly established rule forbidding a clean takedown to end mild resistance . . . ." *Id.* (collecting cases). Examples of resistance that justified some force include kicking and flailing, declining to follow instructions while acting in a belligerent manner, and swatting an arresting officer's hands away while backpedaling. *See Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010); *Brooks v. City of Aurora*, 653 F.3d 478, 481 (7th Cir. 2011). Summary judgment may be appropriate where the

9

refusal to submit to authority is unambiguous on the record before the court. *See Dockery v. Blackburn*, 911 F.3d 458, 468 (7th Cir. 2018) (holding that video evidence unambiguously showed the plaintiff had not submitted to officer's authority before being tasered a second time).

A few themes emerge from these cases that illustrate the distance between previous cases upholding application of qualified immunity and this case. First, unlike the plaintiffs in *Clarett* and *Brooks*, Chavez denies resisting arrest in *any* manner. *See Brooks*, 653 F.3d at 481; *Clarett*, 657 F.3d at 668. In addition, no objective evidence can corroborate Agent Arora's recounting of the facts, which differs from *Brooks* and *Dockery* where the altercations were captured on video. *Brooks*, 653 F.3d at 481; *Dockery*, 911 F.3d at 461. Even if other agents corroborate Arona, the question of their credibility relative to Chavez's is one for the jury. *See Morfin v. City of East Chi.*, 349 F.3d 989, 1005 (7th Cir. 2003).

On the other hand, "an officer may not use significant force . . . against a nonresisting or passively resisting subject." *Dockery*, 911 F.3d at 466 (quotation omitted); *see also Morfin*, 349 F.3d at 1005 (rejecting qualified immunity claim where officers used force against a docile and cooperative suspect); *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) (rejecting qualified immunity where officer forced passive suspect into squad car). "[T]he qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Id.* (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013)).

As in *Morfin*, Chavez claims he did not "pose a threat to the officers" because he was "docile and cooperative" and did not "resist arrest in any way prior to the officers' use of excessive force." *Morfin*, 349 F.3d at 1005.[1] Chavez testified in his deposition, as in *Morfin*, that

---

[1] Although *Smith v. Ball State Univ.*, 295 F.3d 763, 766, 770 (7th Cir. 2002), suggests a "straight arm bar" technique is permissible to remove a nonresponsive driver from an automobile, this

an officer "grabbed him, twisted his arm . . . and took him to the floor." *Morfin*, 349 F.3d at 1005. This case bears a striking similarity to *Morfin*, so we cannot say that a reasonable officer would not be on notice. *See also Abbott*, 705 F.3d at 732 ("Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects." (citing *Morfin*, 349 F.3d at 1005)).

A reasonable jury could conclude that an objective police officer would consider this use of force more likely than not reasonable, but we cannot make that determination without discarding Chavez's evidence to the contrary and crediting Arona's evidence. We therefore decline to grant Defendant summary judgment on the claim that he did not violate a clearly established constitutional right.

## III.     Illinois Tort Immunity Act

The Illinois Tort Immunity Act does not warrant summary judgment here. Section 2–202 of the Illinois Tort Immunity Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2–202. The Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1–210. "Whether the conduct is sufficiently willful and wanton is ordinarily a question of fact for the jury and rarely should be ruled upon as a matter of law." *Liska v. Dart*, 60 F. Supp.3d 889, 906–07 (N.D. Ill. 2014); *see also Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (holding the same). The reasons justifying a denial of qualified

---

case does not imply in any way that the arm bar technique is necessarily lawful. *See McAllister v. Price*, 615 F.3d 877, 885 (7th Cir. 2010).

immunity at summary judgment often also justify denial as to Section 2-202 of the Illinois Tort Immunity Act. *Liska*, 60 F. Supp.3d at 907 (quoting *Beal v. City of Chi.*, No. 4 C 2039, 2007 WL 1029364, at *10 (N.D. Ill. Mar. 30, 2007)).

We have already held that Chavez sufficiently challenged Arona's claim of qualified immunity to survive summary judgment. For much the same reason, summary judgment is inappropriate under the Illinois Tort Immunity Act: from the facts alleged here a reasonably jury could conclude Arona willful or wonton disregard for Chavez's safety. *See Chelios*, 520 F.3d at 693. Whether Arona's actions were willful and wonton conduct largely intersect with whether a reasonable police officer would believe his use of force was justified under the circumstances. *See Liska*, 60 F. Supp. 3d at 907. Therefore, Defendant's motion for summary judgment is also denied as to the Illinois Tort Immunity Act.

## CONCLUSION

For the foregoing reasons, Defendant's summary judgment motion (Dkt. No. 68) is denied. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: February 25, 2020
Chicago, Illinois